**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

SAMIR MUHAMMAD AL-SALIHI, individually
as representative of the estate
of LAYLA SALMAN KHALIL, Deceased,

|                       |                   |
|-----------------------|-------------------|
| **Plaintiff,**        | 3:11-CV–00384     |
| vs.                   | (NAM/DEP)         |

**GANDER MOUNTAIN, INC.,**

**Defendant.**

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

**APPEARANCES:**                                **OF COUNSEL:**

**FISHER & FISHER**                             Kelly E. Fischer, Esq.
142 Front Street
P.O. Box 200
Binghamton, New York  13905
*Attorney for Plaintiff*

**GOLDBERG SEGALLA, LLP**                       Brian T. Stapleton, Esq.
11 Martine Avenue, 7th Floor
White Plains, New York  10606
*Attorneys for Defendant*

**NORMAN A. MORDUE, Senior United States District Judge**:

## MEMORANDUM-DECISION and ORDER

## I.      INTRODUCTION

The present case is one which arises out of the Court's diversity jurisdiction pursuant to

28 U.S.C. § 1332 (c) (1).  The case was removed by defendant from New York Supreme Court in

Broome County.  The dispute concerns a mass shooting and assault that occurred in April 2009 in

the City of Binghamton.  The shootings and assaults were perpetrated by Jiverly Wong.  The

plaintiff herein represents the estate of one of the victims of said shooting.  Defendant, Gander

Mountain, Inc., is an outdoor outfitting company that sells hunting, fishing and camping

equipment. Plaintiff's complaint sounds in wrongful death and negligent entrustment, and is based on Gander Mountain's sale of certain firearms to Wong prior to the shootings. Defendant has moved for summary judgment to dismiss all claims in the complaint. Plaintiff has not opposed defendant's motion.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

The Court notes that the following facts are undisputed by plaintiff since plaintiff has failed to interpose a response to defendant's motion for summary judgment. This case arises out of the shooting deaths of thirteen (13) people, and the injury of four (4) others, at the American Civic Association ("ACA") in Binghamton, New York on April 3, 2009. On the morning of April 3, 2009, Jiverly Wong drove his car to the rear door of the ACA. Wong used his car to barricade the rear exit so those inside could not get out. He then entered the front of the ACA in possession of several loaded firearms. He used those firearms to shoot and kill thirteen (13) unarmed individuals, and to seriously injure four (4) others. Several of his victims were shot more than once. There is no evidence that Wong knew any of his victims, or that any of them were armed. There is no evidence that Wong's shootings were accidental or mistaken. After his rampage, Mr. Wong took his own life.

Plaintiff Samir Muhammad Al-Salihi brings suit against Gander Mountain, Inc. on behalf of his deceased wife, Layla Salman Khalil. Layla Khalil was one of Wong's murder victims. Layla Khalil was an Iraqi immigrant to the United States. At the time of her death, she was living with her husband and youngest son in Binghamton, New York. Jiverly Wong was a Vietnamese immigrant to the United States. At the time of his death, Mr. Wong was also living in the City of Binghamton.

One segment of Gander Mountain's business involves the buying and selling of firearms in interstate commerce. Gander Mountain is the holder of a Federal Firearms License ("FFL") that permits it to buy and sell firearms in interstate commerce. Residents of Broome County who wish to legally possess a firearm must first obtain a permit to do so pursuant to New York Penal Law §§ 265.01, 265.20(a)(3), 400. Every Broome County resident who applies for a firearms permit must fill out an application with the Broome County Sheriff's Department ("BCSD"). The permit application process is confidential, and cannot be accessed by any third party not immediately involved with it as a witness or investigator. Applicants are required to provide proper identifying information and four non-family character references. The BCSD will provide these references with confidential questionnaires about the applicant, the results of which are reviewed by the Sheriff. If the responses provide basis for further inquiry, the Sheriff's BCSD will send out a detectives to interview the references in person. The interviews are confidential. If further investigation is required, the assigned detective will ask the permit applicant himself about the issued raised. The identity of the reference(s) who raised an issue is kept strictly confidential.

The application also requires a mental hygiene check on the applicant. The BCSD requests that the New York State Mental Hygiene Unit search its database and advise if there are records of the applicant being committed (voluntarily or involuntarily) to a public mental institution. If so, those records (even if sealed) are obtained and reviewed by the Sheriff's Department. If the files reveal "a red flag," further investigation is undertaken. The BCSD also requests that all other law enforcement agencies in Broome County conduct an "internal" background check on the applicant. All Broome County law enforcement agencies search their

-3-

records for any complaints in which the applicant was named: traffic tickets, drunk driving complaints, domestic disputes, minor infraction, major infractions, etc.. If the applicant's name appears on a Broome County law enforcement record, those records are forwarded to the Broome County Sheriff's Department for review. If review indicates the need for further investigation, it is undertaken.

Applicants are also fingerprinted, and the prints are sent to the Department of Criminal Justice in Albany for nationwide criminal background check. Certain search results automatically disqualify the applicant: felony convictions, violent misdemeanor convictions, domestic restraining orders, involuntary commitments for a period of greater than thirty days in a mental institution, and declarations of mental incompetence. Once all background investigations are performed, the data is compiled and reviewed by the Broome County Undersheriff, who makes a written recommendation as to whether the permit should be granted.

The recommendation and pertinent documentation are forwarded to a Broome County Court Judge, who ultimately issues or denies the applicant's permit. On many occasions, the Broome County Court Judge would conduct his own investigation of the applicant. Assuming the Court approves the application, a written permit is issued and provided to the applicant.

Once a permit is issued, it physically remains with the holder until it is either temporarily suspended or permanently revoked. This happens when the police receive complaints about the permit holder that require investigation (typically domestic violence disputes, public intoxication, drunk driving, fights, etc.). If the police learn that a permitee has behaved in any fashion that justifies investigation, a temporary surrender of the firearms and license follows. The police request that the permit holder surrender the firearms and the permit.

Both remain with the police until the investigation is completed.  If no grounds exist to retain the firearms and the license, they are returned.  If the investigation reveals that the license should be revoked, the police request a "take away" order from the court.  If granted, the license and firearms remain with the BCSD.

The Broome County Sheriff's Department Civil Division is automatically copied on all restraining orders issued by the Broome County Family, Civil and Criminal Courts.  The civil division reviews the TROs daily to see if a permit holder is involved.  If so, an application for a "take away" order is automatically sent to the judge issuing the restraining order.  When a permit is permanently revoked, the permit and the firearms stay with the Sheriff's Department.  The firearms owners are given an opportunity to sell the arms to another licensed dealer or permit holder.  If they are not sold, the arms are destroyed.

Prior to his deposition in this case, Undersheriff Alex Minor located and reviewed Mr. Wong's un-redacted firearms permit application.  Undersheriff Minor found nothing in the application (or its completed and returned records) that constituted a "red flag" sufficient to deny the application.  Mr. Wong applied for a restricted carry firearms permit in Broome County on June 26th, 1996.  That application was granted, and on June 2nd, 1997 Mr. Wong was issued a Broome County restricted carry firearms permit, license #C18839R.  In the twelve-year interim leading up to April 3, 2009, no criminal or other complaints about Mr. Wong were ever received by the BCSD. Exhibit S at 53-60.  The only incident involving Wong or his family is when Wong's sister called the BCSD to report a suspected break-in at their home.  The police investigated and concluded that no one had broken into the home.

Mr. Wong's restricted carry permit was never suspended or revoked prior to his death.

-5-

Gander Mountain employee David Henderson confirmed that Wong's permit was valid at the time of the firearms sales to Wong. Henderson knew Wong's permit was valid because Wong was in physical possession of the permit when he needed to present it. Had the permit been suspended, revoked, or under investigation for the same, Mr. Wong wouldn't have had it in his possession. Similarly, Undersheriff Minor confirmed that Wong's permit was valid at the time of the shootings, because it was in his possession at that time. Had the license been suspended or revoked it would have been physically taken from him.

In New York the process of selling a firearm involves several steps. The process starts when a potential buyer visits a store that sells firearms, displays a valid firearms permit, and then selects a firearm he/she is interested in buying. The buyer must present a valid permit before he/she is permitted to touch a firearm. Once the buyer selects the desired firearm, the completion of a Bureau of Alcohol Tobacco and Firearms ("BATF") Form 4473 begins. All firearms sellers in the United States are required to fill out a BATF form 4473 for each firearm sold. The purpose of the 4473 form is to allow for the traceability of the subject firearm by law enforcement. The 4473 form is not completed in its entirety in a single sitting: certain sections of the form are completed when the firearm is purchased, and the remaining sections are completed when the firearm is actually transferred. The information on the 4473 form is provided by both the buyer and the seller of the firearm in question. Firearms buyers are required to provide accurate identifying information on questions 1 through 10 in "Section A" of the 4473 form. They are also required to provide correct answers concerning their background in response to questions 11a through 12 on "Section A" of the 4473 form. Firearms sellers are required to provide specific identifying information about the gun being sold, as well as the

individual(s) who participate in the sale.

All firearms buyers must pass a criminal background check as a pre-requisite to the sale. As part of filling out a 4473 form, the seller must request that a criminal background check be performed on the buyer. The results of that check must be documented on the 4473 form by the seller. In New York, these background checks are conducted by the FBI using the National Instant Criminal Background Check System (commonly called the "NICS" system). FBI NICS investigators will provide the seller with either a "deny," "proceed," or "delay" response. A "deny" response means that the sale cannot go forward under any circumstances and is immediately terminated. A "proceed" response means that the buyer has passed the FBI's background check, and the sale can immediately proceed. A "delay" response means that the FBI wishes to investigate the buyer further before issuing a response of "proceed" or "deny." In the event of a "delay" response, the sale of the firearm must wait until either a "proceed" response is received by the seller, or three (3) business days pass from the date the background check was first requested without a NICS response being received.

In the case of a "delay" response, the FBI will typically contact local police and request additional investigation(s) on the buyer. The three-day waiting period triggered by "delay" responses is intended to accommodate these additional investigations. When a "delay" response is received, the local Broome County investigation process is essentially the same as when an individual is applying for a firearm permit: the BCSD requests that all other law enforcement agencies in Broome County conduct a renewed "internal" background check on the potential buyer. All Broome County law enforcement agencies again search their records for any complaints in which the applicant was named: traffic tickets, drunk driving complaints, domestic

disputes, minor infractions, major infractions, etc.. If the buyer's name appears on a Broome County law enforcement record, those records are forwarded to the BCSD for review. If review indicates the need for further investigation, it is undertaken.[1]

If the additional investigation produces a "deny" response, that is communicated to the seller, who in turn advises the potential buyer that the sale cannot proceed. Once the seller receives a "proceed" response, the purchaser pays for the firearm and the seller provides the buyer with his/her Bill of Sale. In Broome County, the buyer must then give the Bill of Sale and his original firearms permit to the BCSD in order to obtain local permission to buy the firearm. The BCSD fills out an amendment form and issues a coupon. The coupon is sent to a Broome County Court judge for signature. Once signed, the coupon is returned to the BCSD. Once a coupon is issued, a description of the firearm is physically added to the buyer's permit.

Until local permission to purchase the firearm is obtained and the buyer's permit is amended, the firearm itself remains in the seller's store. However, once a coupon is issued and the buyer's permit is amended, the buyer will take both documents back to the seller. After the seller verifies the information on the coupon and the license, the remaining sections of the 4473 form are completed. Provided the 4473 form is filled out correctly, the firearm is transferred to the buyer, who takes physical possession of it. At this point the sale and transfer of a firearm is complete.

Gander Mountain trains its employees extensively on how to safely and legally sell

---

[1]

When Gander Mountain receives a "delay" response, it has a policy of waiting at least eight (8) days from the date it requests a NICS check before taking the next step in the sale process. In the Johnson City store, where Wong purchased the pertinent firearms in this case, the policy was to wait ten (10) days to receive a NICS response before proceeding with the transfer.

firearms. Initially, Gander Mountain's training was focused on written materials disseminated by the company. However, Gander Mountain later utilized a computer-based training program called "3.5." The program focuses on how to properly fill out a 4473, and the various issues surrounding this process. There is also a video component to the program. 3.5 is a chapter-based program that requires trainees to pass a test at the end of each chapter before continuing to the next. Updates are circulated by Gander Mountain whenever there is a change in the law. Gander Mountain employees are also given annual refresher courses.

After successfully completing the 3.5 computer course, Gander Mountain trainees are provided with on-the-job experience that consists of being "glued to the side" of a more experienced associate. After a suitable period of observation, trainees are then allowed to make sales on their own. Gander Mountain utilizes a "second check" policy that requires one gun department employee to review a 4473 form filled out by another employee for completeness and accuracy. Gander Mountain employees are trained to suspect and avoid "straw sales" of firearms. A straw sale is the purchase of a firearm by a qualified buyer made on behalf of an unqualified individual. In addition, Gander Mountain trains its employees that they have wide discretion to refuse firearms sales to any potential buyer they deem unsuitable. Circumstances under which sales can be declined include straw sales, intoxicated customers seeking to buy firearms, customers who appear mentally unstable, or customers who become belligerent in the store. This discretion is not limited to any particular reason, but can be based on any reason at all. If a Gander Mountain employee feels that a buyer is inappropriate, the employee can decline a sale or terminate it at any time.

Gander Mountain employees face no employment repercussions if a sale is refused.

-9-

However, Gander Mountain trains its employees to always involve another employee in the refusal decision.  As a practical matter, this happens in any event since the frustrated buyer invariably demands to speak to a manager after being told he can't buy a firearm.   As a result, there is always "more than one set of eyes" on the refusal decision.

Over the course of several years, Jiverly Wong bought seven (7) different firearms from dealers in Owego, Endicott and Johnson City, New York.  Mr. Wong sold five (5) of these firearms back to various firearms dealers.  These dealers included Ben's Gun Shop in Owego, New York, McLains Sport Goods in Endicott, New York, West Endicott Arms in Endicott, New York, and the Gander Mountain Store in Johnson City, New York.  Two (2) firearms were recovered from the scene of Mr. Wong's shooting rampage: a Beretta 92 FS 9mm pistol (serial number BER403241) and a Beretta PX4 Storm .45 caliber pistol (serial # PKO7133).  Mr. Wong purchased these firearms at Gander Mountain's Johnson City store.

Wong paid for the Beretta 92 FS 9mm pistol ("the 92 FS") on March 7, 2008.  Prior to this sale, the 92 FS had been shipped to Gander Mountain's Johnson City store from its store in Fredericksburg, Virginia.  On March 7, 2008, Gander Mountain requested a NICS check on Mr. Wong in connection with the sale of the 92 FS.  On March 9, 2008, Gander Mountain received a "proceed" response from the FBI authorizing the sale of the 92 FS.  Wong obtained the written permission of the Broome County Court to purchase the 92 FS on March 18, 2008.
He subsequently had the 92 FS added to his restricted carry permit.  The 92 FS was transferred to Wong by Gander Mountain on March 21, 2008.

Wong paid for the Beretta PX4 Storm pistol ("the PX4") on January 30, 2009.  Prior to this sale, the PX4 had been shipped to the Gander Mountain's Johnson City store from firearms

distributor and FFL holder Bill Hicks & Co., located in Minneapolis, Minnesota. Gander Mountain initially requested a NICS check on Mr. Wong in connection with the sale of the PX4 on January 30, 2009. On February 1, 2009 Gander Mountain received a "proceed" response from the FBI. Wong obtained the written permission of the Broom County Court to purchase the PX4 on February 12, 2009. Mr. Wong subsequently had the PX4 added to his restricted carry permit. For reasons that are unknown, Mr. Wong did not return to Gander Mountain's Johnson City store to finish the PX4 transaction until March 11, 2009. Since this was more than thirty (30) days after the 4473 form was initially filled out and the NICS check was requested, a new 4473 form had to be filled out, and a new background check had to be completed. Accordingly, on March 11, 2009 the original 4473 form for the PX4 was voided, and a new 4473 form was started. On March 11, 2009, Gander Mountain requested a second NICS check in connection with the sale of the PX4. Gander Mountain received a "delay" response to this second request. The delay response indicated that the PX4 could be transferred by March 17, 2009 in the event no further NICS response was received by that date. Gander Mountain did not receive any further response from NICS by March 21, 2009. On March 21, 2009, Gander Mountain transferred the PX4 to Mr. Wong. The transfer took place ten (10) days after the second NICS check was requested by Gander Mountain.

The identifying information provided by Mr. Wong on the 92 FS 4473 form was accurate. Mr. Wong correctly answered the questions about his background on the 92 FS 4473 form. The information provided by Gander Mountain on the 92 FS 4473 form complies with the Gun Control Act of 1968, 18 U.S.C. § 921 et seq.. The identifying information provided by Mr. Wong on the PX4 4473 form was accurate. Mr. Wong correctly answered the questions

about his background on the 4473 form for the PX4.  The information provided by Gander

Mountain on the PX4 4473 form complies with the Gun Control Act of 1968, 18 U.S.C. § 921 et

seq.

Layla Salman Khalil was taking an English course inside the ACA on the morning of

April 3, 2009.  Ms. Khalil and Jiverly Wong did not know each other at the time of the shootings.

At the time of the shootings, Ms. Khalil was unarmed and defenseless.  Ms. Khalil did nothing to

provoke Mr. Wong.  In shooting Ms. Khalil, Mr. Wong acted as the initial aggressor and his

shooting of Ms. Khalil was without factual justification Mr. Wong's shooting and killing of Ms.

Khalil were criminal acts.

On April 1, 2011, plaintiff Samir Muhammad Al-Salihi, acting as an individual

person and as representative of the estate of Mr. Khalil, filed a summons with notice and

complaint against Gander Mountain in the Broome County Supreme Court.  Plaintiff's action

seeks to impose civil liability upon Gander Mountain for its sale of the PX4 and the 92 FS pistols

to Wong and seeks to recover monetary damages in the amount of $3.5M based on Wong's

criminal use of the PX4 and 92FS pistols at the ACA on April 3, 2009.  Plaintiff's complaint

alleges that: 1) in 2008 and 2009 JiverlyWong purchased firearms from Gander Mountain; 2)

prior to and at the time of these sales Wong exhibited behavior indicating that he was "mentally

unstable, angry, upset, aggressive…and likely to use the weapons in a manner involving

unreasonable risk of physical injury to others; 3) Wong had encounters with Gander Mountain

employees during which he cursed at them, and was so "difficult" that Gander Mountain

employees needed help from other employees to assist him.  Plaintiff alleges that these events

should have put Gander Mountain on notice that Wong was dangerous, and that Gander

Mountain's sale of the weapons constitutes negligent entrustment. According to plaintiff, Gander Mountain is liable for selling firearms to Wong, an individual who was clearly unfit to possess them.

On June 9, 2011, Gander Mountain propounded interrogatories upon the plaintiff seeking, inter alia, the date(s), time(s) and location(s) of Wong's allegedly threatening behavior; specific description(s) of the behavior Wong engaged in showing he was "aggressive, mentally unstable and threatening"; and the identities of the Gander Mountain employees who witnessed all such behavior. On September 20, 2011, plaintiff responded to Gander Mountain's interrogatories. In response to Gander Mountain's demand for the date(s), time(s) and location(s) of Wong's allegedly threatening behavior, plaintiff's counsel claimed a lack of knowledge and a resulting need for further discovery. Otherwise, plaintiff's counsel generally identified the only locations of Mr. Wong's alleged conduct as the being "Gander Mountain store in Johnson City" and the "Broome County Library." In response to Gander's demand for specific description(s) of the threatening behavior Wong engaged in, plaintiff's counsel claimed it was "impossible" to respond without further discovery. Otherwise, plaintiff's counsel claimed that Wong "acted in an angry manner," or "used aggressive language," or became "obviously upset and angry" with Gander Mountain employees. Plaintiff's counsel failed to specify any date(s), time(s), location(s), or other participant(s) to these episodes besides Mr. Wong. Likewise, plaintiff's counsel failed to identify with any particularity the specific manner in which Wong behaved toward or interacted with any Gander Mountain employee(s) such that Gander Mountain should have been put on notice that Wong posed a risk of harm. In response to Gander Mountain's demand for specific the identities of the employees who witnessed all such threatening behavior by Jiverly Wong,

plaintiff's counsel identified only David Henderson and James Bedrin. However, plaintiff's counsel failed to identify the date(s), time(s), or location(s) of any interactions between Wong, Henderson and/or Bedrin. He also failed to identify with any particularity the specific manner in which Wong interacted with Henderson and/or Bedrin such that Gander Mountain should have been put on notice that Wong posed a risk of harm.

Following receipt of the plaintiff's initial discovery responses, present and former Gander Mountain employees were deposed, including James Bedrin, David Henderson, Benjamin Clute and Kevin McKown. Henderson, Clute and Bedrin all testified about their interactions with Mr. Wong inside and outside of Gander Mountain's Johnson City Store. Gander maintains surveillance video in all of its stores, and was able to isolate clips of Wong in the Johnson City store prior to the shootings. Following the completion of these depositions, defense counsel wrote to plaintiff's counsel requesting that his responses to Gander Mountain's interrogatories be supplemented. Plaintiff's counsel failed to supplement his interrogatory responses as requested. On or about June 21, 2012, counsel for Gander Mountain propounded detailed requests for admissions on plaintiff's counsel. Plaintiff's counsel failed to respond to Gander Mountain's requests for admissions.

Gander Mountain's surveillance cameras captured footage of Mr. Wong inside the Johnson City store on different occasions. The video clips show Mr. Wong standing calmly at the gun counter in the Johnson City store, speaking with various Gander Mountain employees and inspecting firearm(s). The clips also show numerous customers walking byWong and standing right next to him; neither his presence nor his behavior provoke any visible reaction in these customers. At no time does Mr. Wong behave in an agitated manner on video. At no time does

Mr. Wong behave in an angry manner on video.  At no time does Mr. Wong behave in a threatening manner on video.  At no time does Mr. Wong behave in an aggressive manner on video.

Wong was well-known to Gander Mountain employees Bedrin, Clute and Henderson.  Mr. Wong was a "regular" in the firearms department.  He was a quiet man who frequently visited the store, was always by himself, and never caused trouble while on the premises.  Wong was a Vietnamese immigrant who spoke English as a second language.  Wong had difficulty speaking and understanding English clearly.  Clute and Bedrin seemed to understand Wong the best, and they therefore dealt with him most often.

Mr. Bedrin was employed by Gander Mountain for approximately 3.5 years and during this time Bedrin personally interacted with Wong between twenty (20) and fifty (50) times although he saw Wong in the store more times than this.  One of Mr. Bedrin's titles was ammunition specialist.  In this context, he personally dealt with Wong "dozens and dozens" of times.  Bedrin also dealt with Wong when he wished to buy a firearm, although much less frequently than when he helped Wong purchase ammunition.  At no point in time during any of these instances did Wong ever behave in a manner that Mr. Bedrin felt was threatening, potentially violent, or otherwise unusual. [2]

_____

[2]

During his deposition transcript, Bedrin gave the following testimony concerning his observations of Wong's behavior:

Q: Now, during the time that Mr. Wong was in the store with you and you personally interacted with him, did he ever behave in a way that led you to think he was threat of harm to himself?

A: Absolutely not.

Q: Different question. At any time when he was in the store and you were dealing with him, did he ever behave in a way that led you to think he was a threat of harm to others?

A: Absolutely not.

Q: Did he ever voice to you or while you were in his presence to another person, that he was going to harm himself with a firearm he was purchasing from Gander Mountain?

(continued...)

Mr. Henderson was employed by Gander Mountain from August 2006 to December 2006 as a part-time salesman in the Gun Department. He became a full-time employee in January 2007, and continued in that capacity until April 2009. Mr. Henderson's employment was terminated for violations of GM's policy regarding unauthorized communications with news media. Henderson testified that he understood and agreed with his termination. Mr. Henderson clearly recalled his interactions with Jiverly Wong. He dealt with Mr. Wong in the GM store on three (3) separate occasions. In addition, Henderson had a very, very brief encounter with Wong at a local Wegman's Supermarket. At all times during these interactions, Wong was alone. Henderson's first interaction with Mr. Wong was when Wong came to the store to buy a handgun. Henderson could not recall the make, model, or caliber of the firearm Wong wanted to purchase. At this time, Wong had a valid permit. He selected the firearm he wanted, handled it, and asked Henderson some questions. Although the 4473 form was not completely filled out, Wong did provide certain information. Henderson recalled noting to Wong that he (Wong) was not Vietnamese. Henderson said that Wong appeared to be "touched" by Henderson's observation. Henderson believed that Wong was Korean or possibly Chinese. Wong told Henderson that he'd been discriminated against in Vietnam his whole life because he was not Vietnamese. Wong seemed to appreciate the fact that Henderson noted his

[2](...continued)
A: No, absolutely not.
Q: Did he ever, while either in your presence or to you personally, indicate that he was going to harm anybody else with a firearm he was either purchasing or transferring from Gander Mountain?
A: No, absolutely not.
Q: I want you to look back on all your interactions with Mr. Wong in the store, did he ever behave in a way that led you to think, for any reason whatsoever, that you should not allow this man to buy a firearm?
A: No.

*See* Deposition Transcript of James Bedrin, pp. 34-36.

national origin did not appear to be Vietnamese.  This first episode with Wong was very brief, and at no time during it did Wong display any kind of behavior that was unusual, threatening, or indicative of a potential threat to himself or others.

Henderson's second interaction was when Mr. Wong later returned to buy a different gun.  Wong said he'd changed his mind regarding his initial purchase, and now wanted to buy a different firearm.  The purchase of an additional firearm while a single firearm transaction was pending is against Gander Mountain's company policy, and Henderson advised Wong of this.  Wong said something to Henderson in response that Henderson couldn't understand.  Henderson asked Mr. Wong to repeat himself, and Wong did so, verbatim.   Unfortunately, Henderson still could not understand what Wong was saying and, again, asked Wong to repeat himself.

Wong then became frustrated, displaying what Henderson called a momentary "flash," and "anger borne of frustration."  Henderson offered to find someone else who could help Wong, and Wong immediately calmed down.  This entire exchange lasted less than five (5) minutes.  Henderson eventually passed Wong off to James Bedrin and Randy Hilligus for further assistance.  Hilligus and Bedrin helped Mr. Wong while Henderson went on to help other customers.  This second episode was, again, very brief, and at no time during it did Wong display any kind of behavior that was unusual, threatening, or indicative of a potential threat to himself or others.

Later, Henderson commented about this second occurrence to the local press.  Shortly after the shootings Mr. Henderson received a call from a Binghamton Press and Sun Bulletin reporter.  He was questioned about Wong's firearms permit, and whether he knew Wong.  He told the reporter "off the record" about the second interaction previously described: that Wong had

-17-

briefly gotten mad at him once while discussing a firearm, and that because of language difficulties, he had to pass Mr. Wong off to another employee. Henderson knew at the time that his speaking to the reporter was a violation of Gander Mountain policy, and that he risked his own termination by doing so. Mr. Henderson described his own actions this way: "I knew what I was doing was wrong and there was a chance I could be terminated for it…" By the next day he was getting calls from major media outlets like the New York Post and the Associated Press. Henderson felt he'd been "thrown under the bus" by the BPSB reporter, who completely mischaracterized what he'd said.

Henderson's third interaction with Wong occurred when Wong returned to the store to pick up a firearm he'd previously purchased. He presented the local approval coupon to Henderson, and Henderson went into the back vault to find the firearm. He couldn't find it right away. After searching for some time, he returned to the customer counter to discover that Benjamin Clute had already retrieved the firearm and was working with Wong to finish the purchase. This last episode, like the others, was very brief. At no time did Wong display any kind of behavior at was unusual, threatening, or indicative of a potential threat to himself or others.[3]

---

[3]

During his deposition, Henderson testified as follows concerning his interactions with Wong:

Q: Now, just again, during this entire time, from start to finish…did Mr. Wong do or say anything in your presence that would have led you to suspect that he was a threat to himself?
A: No.
Q: Did he do or say anything in any way in your presence that would have led you to suspect he was threat of harm to himself or others?
A: No.
Q: Did he issue any kind of threats?
A: No.
Q: Did he appear mentally disturbed or agitated or emotionally upset in any way?
A: No.

(continued...)

From 2006 until 2009 (the same time as he worked for Gander Mountain in Johnson City),

James Bedrin worked for the Broome County Government Security office on a part-time basis.

He was assigned security details at various public facilities, one of which was the Broome County

---

[3](...continued)
Q: Was there anything about his behavior in any way that would have led you, in your discretion and based on your experience and training, to terminate that transaction then and there?
A: No.
Q: Now while you were there with Mr. Wong … did any other Gander Mountain employee come up to you and say anything to you, and I'm making this up, but the example would be: there he is again, you know, watch out for this guy, he's trouble, you've got to be aware of him; anything like that?
A: No.

*See* Deposition Transcript of David Henderson, at pp. 47-48.

Henderson testified that Mr. Wong's "flash of anger" lasted perhaps five seconds, and Henderson described his behavior during it as follows:

Q: How long did that last?
A: Not more than ten seconds, five seconds. Very short.
Q: Once you said that I'm going to get somebody else, he calmed down?
A: He literally said, okay. Yes. He was fine with whoever the next person was because I stood right there because I wanted to make sure what he was asking, that I understood.

*See* Deposition Transcript of David Henderson, at p. 57.
. . .
Q: Okay. Now, at that point in time when he made clear to you, when he was voicing his displeasure, was he using foul language?
A: Not that I remember, no.
Q: Was he using any kind of language that you perceived to be threatening?
A: No. No.
Q: Did he ever actually verbally threaten you at that point in time?
A: No.
Q: In other words, say to you, I'm going to do this or that?
A: No. Absolutely no.
Q: Did he behave in any way during that period of time when he was upset, that very discrete period of time, did he behave in any way that would lead you to believe that he was a threat of harm to himself?
A: No.
Q: Did he behave in any kind of way, either physically, verbally, any other kind of way that you could sense or observe that led you to suspect that he was a threat of harm
to others?
A: No.
Q: Had he done so at that time, what would you have done?
A: I would have terminated the conversation and the transaction, even though he had already bought the firearm, the original firearm.
Q: You had the power to do that?
A: Yes.

*See* Deposition Transcript of David Henderson, at pp. 55-56.

Public Library.  Mr. Bedrin worked evenings, and virtually every time he did security there, he would see Wong sitting at one of the computer pods.  On his very first evening of work as a security guard, he and Wong had an encounter at the library that involved Wong drinking a can of soda at the computer pod.  This was the very first time Bedrin ever encountered Wong.  As Bedrin was making his rounds, he walked by Wong (who was sitting quietly by himself at a pod).  Bedrin saw that Wong had a can of soda at the computer terminal, which was against library rules. Bedrin told Wong so, and that Wong needed to get rid of his soda.  Mr. Wong turned to Mr. Bedrin and said "fuck you, I have my rights."  He said this quietly: he didn't get up from his chair, gesticulate wildly, raise his voice, or otherwise cause a disturbance.  Bedrin persisted, and Wong got up from the terminal, walked to a nearby garbage can, and threw the soda away.  He then sat back down, and resumed working quietly at the computer.  At no point were there raised voices, animated physical gestures, or any other such kind of behavior.   Bedrin denied that this encounter was unusual or led him to suspect that Wong was a threat of harm to himself or others.

This was the first time Bedrin ever encountered Wong, and he would go on to have many, many interactions with him over the next three (3) years.  Bedrin routinely saw Wong in the library, and they regularly acknowledged each other's presence.  Bedrin saw Wong in the Johnson City store dozens of times.  Their interactions were normal and polite.  In fact, Bedrin suspected that Wong subsequently acted on his "best behavior" in the store because he was embarrassed about that first night in the library.

As a result of failing to respond to Gander Mountain's requests for admissions, plaintiff has made the following dispositive admissions: 1) plaintiff has no facts showing that Jiverly Wong ever issued a verbal threat of harm to anyone while he was present in Gander Mountain's

Johnson City store prior to the April 3, 2009, shootings; 2) Plaintiff has no facts showing that Jiverly Wong ever issued a verbal threat of harm to any Gander Mountain employee during any encounters with such employees outside of Gander Mountain's Johnson City store prior to the April 3, 2009, shootings; 3) Plaintiff has no facts showing that Jiverly Wong ever behaved in manner that indicated a threat of harm to anyone while he was present in Gander Mountain's Johnson City store prior to the April 3, 2009, shootings; and 4) Plaintiff has no facts showing that Jiverly Wong ever behaved in manner that indicated a threat of harm to any Gander Mountain employee during any encounters with such employees outside of Gander Mountain's Johnson City store prior to the April 3, 2009, shootings.

On December 16, 2011, Gander Mountain filed a third-party complaint against the estate of Jiverly Wong. The third-party complaint alleged that Wong's crimes were the sole, proximate cause of plaintiff's damages and sought indemnity and contribution from the Wong estate on that basis. The Wong estate failed to appear or timely file a responsive pleading. On June 28, 2012, Gander Mountain filed a request for a certificate of entry of default judgment against the Wong estate. A Clerk's entry of default was filed on June 29, 2012. On June 29, 2012, Gander Mountain filed a motion for default judgment against the Wong estate. This Court granted Gander Mountain's motion for default judgment on July 18, 2012.

Plaintiff never filed a jury demand in the present action. Based thereupon, on March 27, 2012, Magistrate Judge David Peebles amended the Uniform Pretrial Scheduling Order to reflect that given the absence of a jury demand, the case would be tried as a bench trial.

The present motion was filed on October 1, 2012, and is unopposed.

**III.    DISCUSSION**

A.     Applicable Legal Standard

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56 (c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

B.     The Protection of Lawful Commerce in Arms Act ("PLCAA")

On October 26, 2005, the Protection of Lawful Commerce in Arms Act ("PLCAA"), codified at 15 U.S.C. §§ 7901–03, became federal law. The PLCAA's stated primary purpose is:

> To prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended.

*Id.* § 7901(b) (1). The PLCAA mandates dismissal of lawsuits against gun retailers unless the retailer has violated a federal or state statute applicable to sale or marketing of firearms.

The PLCAA provides that any "qualified civil liability action that is pending on October 26, 2005, shall be immediately dismissed by the court in which the action was brought or is currently pending." 15 U.S.C. § 7902(b). A "qualified civil liability action" is:

> a civil action or proceeding ... brought by any person against a manufacturer or seller of a [firearm distributed in interstate or foreign commerce] ... for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a [firearm distributed in interstate or foreign commerce] by the person or a third party.

15 U.S.C. § 7903 (5) (A).

Congress enacted the PLCAA in response to "[l]awsuits ... commenced against manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended, which seek money damages and other relief for the harm caused by the misuse of firearms by third parties, including criminals." 15 U.S.C. § 7901(a) (3). Congress found that manufacturers and sellers of firearms "are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended." *Id.* § 7901(a) (5). Congress found egregious "[t]he possibility of imposing liability on an entire industry for harm that is solely caused by others." *Id.* § 7901(a) (6). The PLCAA provides for six exceptions to the definition of a "qualified civil liability

-23-

action." *See* 15 U.S.C. § 7903(5) (A) (i)-(vi). Most relevant to this case, a "qualified civil

liability action" does not include an action brought against a seller for negligent entrustment or

negligence per se. *See* 15 U.S.C. § 7903(5) (A) (ii). " '[N]egligent entrustment' means the

supplying of a qualified product by a seller for use by another person when the seller knows, or

reasonably should know, the person to whom the product is supplied is likely to, and does, use the

product in a manner involving unreasonable risk of physical injury to the person or others." *See*

15 U.S.C. § 7903(5) (B). The PLCAA standard mirrors the standard for the tort of negligent

entrustment under New York law which is based on the degree of knowledge the supplier of a

chattel has or should have concerning the entrustee's propensity to use the chattel in an improper

or dangerous fashion. *See Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 237 (2001). The

owner or possessor of a dangerous instrument is under a duty to entrust it to a responsible person

whose use does not create an unreasonable risk of harm to others. *See*, *Rios v Smith*, 95 N.Y.2d

647, 652 (2001); *Splawnik v Di Caprio*, 146 A.D.2d 333, 335 (3d Dep't 1989); Restatement

[Second] of Torts § 390). Indeed, "[o]ne who supplies ... a chattel for the use of another whom

the supplier knows or has reason to know to be likely because of his youth, inexperience, or

otherwise, to use it in a manner involving unreasonable risk of physical harm to himself ... is

subject to liability for physical harm resulting to them." (Restatement [Second] of Torts § 390

[1965]. If such knowledge the supplier had or should have had concerning the entrustee's

propensity to use the chattel in an improper or dangerous fashion can be imputed, the supplier

owes a duty to foreseeable parties to withhold the chattel from the entrustee. *See McCrink v. City

of New York*, 296 N.Y. 99, 107 (1947); *Allstate Ins. Co. v. Reliance Ins. Co.*, 85 Misc 2d 734, 741

(Sup. Ct. 1976); *Sickles v. Montgomery Ward & Co.*, 6 Misc 2d 1000, 1002 (Sup. Ct. 1957) *see*

*also, Foster v. Arthur*, 519 So.2d 1092, 1094-95 (Fla. App. 1988) (duty of gun owner to avoid entrusting gun to person known to be violent and dangerous).

C.    Application of PLCAA

1.    Whether Gander Mountain is a Qualified Seller

15 U.S.C. §7903(6) defines a "qualified seller" as a licensed firearms importer, a licensed firearms dealer, or a person engaged in the business of selling ammunition in interstate or foreign commerce at the wholesale or retail level.  Gander Mountain is a licensed firearms dealer, and holds a Federal Firearms License to buy and sell pistols, long arms, and ammunition. In addition, Gander Mountain operates retail outdoor outfitting companies in several states, a significant segment of which retail business is the sale of firearms and ammunition.  Based thereupon, the Court finds that Gander Mountain is a "qualified seller" pursuant to the PLCAA.

2.    Whether the Firearms Wong Purchased Were "Qualified Products"

18 U.S.C. §7903 (4) defines a "qualified product" as a firearm, an antique firearm, ammunition, or a component part of a firearm or ammunition, that has been shipped or transp0rted interstate or foreign commerce.  The 92 FS and the PX4 used by Wong during the shootings were obviously firearms, and both had travelled through interstate commerce prior to Wong buying them from Gander Mountain.  The Beretta 92 FS was transferred to the Johnson City store from Gander Mountain Store #340, which is located in Fredericksburg, Virginia.  The Beretta PX4 was transferred to the Johnson City store from an FFL located in Minneapolis, Minnesota.  Thus, the Court finds that the guns Wong purchased from Gander Mountain were "qualified products" within the meaning of the PLCAA.

3.    Whether Sales of Guns to Wong Were Legal

-25-

Gander Mountain, as the holder of a valid FFL, was lawfully permitted to sell the 92 FS and the PX4 to Jiverly Wong. At the time of both sales, Wong was the holder of a valid Broome County restricted carry permit that had never been suspended or revoked. As such, he was lawfully permitted to buy the 92 FS and the PX4 from Gander Mountain. The sales of the 92 FS and the PX4 satisfied all background check and waiting period requirements. Gander Mountain requested a NICS check for the sale of the 92 FS on March 7, 2008. On March 9, 2008, Gander received a "proceed', response from the FBI authorizing the sale of the 92 FS to Wong. Wong then had the 92 FS added to his permit and obtained a coupon for that sale from the Broome County Court on or about March 18, 2008. All of these events transpired prior to the transfer of the 92 FS by Gander to Wong on March 21, 2008.

Gander Mountain initially requested a NICS check on Mr. Wong in connection with the sale of the PX4 on January 30, 2009. Gander Mountain received a "proceed,' response from the FBI on February 1, 2009. Wong obtained the written permission of the Broom County Court to purchase the PX4 on February 12, 2009 and subsequently had the PX4 added to his restricted carry permit. Because Wong did not return to Gander's Johnson City store to finish the PX4 transaction until March 11, 2009 (more than thirty (30) days after the 4473 form was initially filled out and the NICS check was requested), a new 4473 form had to be filled out, and a new background check had to be completed for the sale of the PX4. This was done on March 11, 2009. The original 4473 form for the PX4 was voided, and a new 4473 form was started. On the same date, Gander Mountain requested a second NICS check in connection with the sale of the PX4. The second NICS request produced a "delay" response from the FBI. Under federal law, the PX4 could be transferred by March 17, 2009, in the event no further NICS response was

received by that date. However, Gander Mountain, following its own, more extended "waiting period" policy, waited ten (10) days from the date it requested the second NICS check to hear back from the FBI. When Gander Mountain did not receive any further response from NICS by March 21, 2009, it transferred the PX4 to Wong.

Defendant avers that all of the 4473 forms filled out by Wong and Gander Mountain were completed properly, and the information contained on them was accurate. Defendant asserts that the 4473 forms detailing the transfers of the 92 FS and PX4 from Gander to Wong complied with the Gun Control Act of 1968, 18 U.S.C. § 921. After having reviewed the forms and the applicable law and in the absence of any factual or legal arguments from plaintiff concerning deficiencies in the gun sales to Wong, the Court finds that the sales of the subject guns to Wong in this case were legal.

4.      Whether Wong's Use of the 92 FS and the PX4 on April 3, 2009 Was Criminal

There is no doubt in this case that Wong's actions on April 3, 2009, were criminal. He used his car to barricade the rear exit of the ACA so those inside couldn't get out. He then entered the front of the ACA in possession of the loaded PX4 and 92 FS pistols, which he used to shoot and kill thirteen (13) unarmed individuals, and to seriously injure four (4) others. Several of Mr. Wong's victims were shot more than once. There is no evidence that Wong knew any of his victims, or that any of them were armed. There is no proof that Wong's shootings were factually justified. There is no evidence that Wong's shootings were accidental. These facts are undisputed and unquestionably tragic.

5.      Whether the Present Complaint is a "Qualified Civil Liability Action" under the PLCAA

15 U.S.C. § 7903(5) (A) defines a "qualified civil liability action" as a civil action for

damages and other relief, brought by any person against a manufacturer or seller of a firearm that has been shipped or transported interstate or foreign commerce, resulting from the criminal or unlawful misuse of the firearm.  The plaintiff's complaint against Gander Mountain seeks $3.5M in damages, and is predicated solely on the fact that Jiverly Wong used either the 92 FS or the PX4 to shoot and kill Layla Salman Khalil while she was inside the ACA on April 3, 2009.  As shown above, the actions of Jiverly Wong on that date were patently criminal.  Thus, the Court finds that plaintiff's complaint constitutes a "qualified civil liability action" under the PLCAA.

6.      Whether the "Negligent Entrustment" Exception Applies to Plaintiff's Complaint

        Plaintiff has presented  no evidence showing that Gander Mountain knew, or should have known, that Wong would use the 92 FS or PX4 pistols in a manner that posed an unreasonable risk of harm to others.  There is no testimonial or physical evidence to support this claim, and plaintiff, by failing to respond to defendant's request for admissions, has made dispositive admissions that he possesses no facts to support it this claim.  As a further matter, upon review of the evidentiary record in this case, the Court is unable to discern material questions concerning whether Gander Mountain knew or should have known that Wong posed a threat to himself or the public.

        The only supposed witnesses to Wong's threatening behavior that plaintiff has identified are James Bedrin and David Henderson.  Plaintiff claimed that Bedrin and Wong had interaction at the Broome County Public Library that ought to have put Gander Mountain on notice of Wong's potential danger.  But as referenced above in Bedrin deposition testimony, his brief initial encounter with Wong over having a contraband soda in the computer area of the library did not result in raised voices or animated physical gestures on the part of Wong.  Plaintiff alleges that

-28-

Mr. Wong's cursing at Bedrin during this incident ought to have put Gander Mountain on notice of Wong's potential for harm. However, it was clear from Bedrin's testimony, that he was not alarmed by Wong's words or behavior during this incident. Wong spoke quietly to Bedrin, he did not get up from his chair or otherwise cause a disturbance. Bedrin said that nothing about this encounter led him to suspect that Wong was a threat of harm to himself or others. Moreover, after this initial unpleasant encounter with Wong, Bedrin went on to have many, many more interactions with Wong over the next three (3) years. Bedrin routinely saw Wong in the library, and they regularly acknowledged each other's presence. Bedrin saw Wong in the Johnson City store dozens of times. Their interactions were always normal and polite. In fact, Bedrin suspected that Wong subsequently acted on his "best behavior" in the store because he was embarrassed about that first night in the library.

The same is true of the testimony provided by David Henderson. Wong was well known to Henderson. Henderson (like Bedrin and Benjamin Klute) knew that Wong was a "regular" in the firearms department who always visited the store by himself and never caused trouble. Henderson had several personal interactions with Wong and none of these ever led Henderson to suspect that Wong posed an unreasonable risk of harm to himself or others. Henderson described how, during one of these interactions, Wong showed a flash of anger caused by Henderson's repeated inability to understand what Wong was saying. Henderson called it a momentary "flash" and "anger borne of frustration." When Henderson offered to find someone else who could help Wong, he immediately calmed down. Henderson found Wong's frustrations understandable. According to Henderson, the entire exchange lasted less than five (5) minutes. At no time during this episode or any other, did Wong display to Henderson any kind of behavior that was unusual,

threatening or indicative of a potential threat to himself or others.  Defendant argues and the Court agrees that like the "library incident," this episode was possibly regrettable, but hardly a reasonable or accurate predictor of the terrible actions Wong would later take.

Gander's Mountain's surveillance cameras captured footage of Mr. Wong inside the Johnson City store on different occasions.  The video clips show Mr. Wong standing calmly at the gun counter in the Johnson City store, speaking with various Gander Mountain employees and inspecting firearm(s).   At no point, does Mr. Wong behave in an agitated, angry, threatening or aggressive manner on video.  Moreover, at all times relevant herein, Mr. Wong was in possession of a valid restricted carry permit.  Mr. Wong's possession of that permit meant that: Wong passed all investigation(s) of his criminal background, personal background and mental hygiene that were conducted prior to the permit's issuance, and that nothing disqualified him from buying a gun.  Undersheriff Alex Minor testified that he found nothing in Mr. Wong's un-redacted firearms permit application or the completed and returned records that constituted a "red flag" sufficient to deny the application.

Mr. Wong was granted a Broome County restricted carry firearms permit in 1997.  In the twelve-year interim leading up to April 3, 2009 no criminal or other complaints about Mr. Wong were ever received by the BCSD.  Undersheriff Minor confirmed that Wong's permit was valid at the time of the shootings, because it was in his possession at that time.  Wong passed NICS checks for the sales of the 92 FS and the PX4.  After a second NJCS' check on the PX4 produced a "delay" response, Gander Mountain never received any information from the FBI, the BCSD, or any other law enforcement indicating that the sale of the PX4 shouldn't go forward.  Mr. Wong was successful in obtaining Broome County Court coupons for both sales. Based upon the Court's

review of the record in this case, there is simply no evidence demonstrating that prior to the sales of the 92 FS d the PX4, Gander Mountain knew or should have known that Wong posed an unreasonable risk of harm to himself or others.

**IV.    CONCLUSION**

Based on the foregoing, the Court finds that this case is a "qualified civil liability action" under the PLCAA and further, that the "negligent entrustment" exception does not apply insofar as removing this action from the definition of a "qualified civil liability action." Therefore, the action must be dismissed under the PLCAA as unlawful. Thus it, is hereby

ORDERED that defendant's motion for summary judgment (Dkt. #29) is GRANTED and the complaint is hereby dismissed with prejudice.

IT IS SO ORDERED.

Date:   September 20, 2013

Norman A. Mordue
Senior U.S. District Judge